**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| STATE OF FLORIDA; and FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,<br>*Plaintiffs*,<br>v.<br>CENTERS FOR MEDICARE AND MEDICAID SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, *in his official capacity as Administrator for the Centers for Medicare and Medicaid Services*; and ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of Health and Human Services*,<br>*Defendants*. | No. 3:26-cv-915-TKW-ZCB |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs State of Florida and the Florida Agency for Health Care Administration ("AHCA")[1] bring this civil action for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706,

[1] The State of Florida and AHCA are referred to collectively as "Florida" throughout this Complaint.

and the Freedom of Information Act ("FOIA"), *id.* § 552, against Defendants Centers for Medicare and Medicaid Services ("CMS"); the U.S. Department of Health and Human Services ("HHS"); Dr. Mehmet Oz, in his official capacity as Administrator of CMS; and Robert F. Kennedy, Jr., in his official capacity of Secretary of HHS. Florida respectfully requests expedited review of its FOIA claims under 28 U.S.C. § 1657(a).

2. On June 22, 2023, Governor DeSantis signed into law Florida H.B. 121 to substantially expand the provision of subsidized health insurance to children in the State of Florida. *See* An Act Relating to Florida KidCare Program Eligibility, Fla. Laws ch. 2023-277 ("H.B. 121"). That expansion, like the long-standing program it builds on, depends on the collection of modest monthly premiums from participants. CMS has unlawfully sought to undermine that requirement, impeding Florida's efforts to provide health insurance coverage to more children in need.

3. Florida has provided subsidized health insurance for more than three decades to children in low- and moderate-income families who do not qualify for Medicaid. Since 1998, Florida has administered this insurance as part of the Children's Health Insurance Program ("CHIP"), a federal-state partnership under Title XXI of the Social Security Act, Pub. L. No. 105-33, § 4901, 111 Stat. 251, 552 (1997). CHIP allows States to obtain federal

reimbursement for certain related expenditures so long as their programs have been approved by CMS and generally comply with federal standards. 42 U.S.C. § 1397ff(a), (d)(2). As of November 2025, Florida CHIP provides subsidized insurance coverage for nearly 150,000 children. Florida KidCare, *Caseload Social Services Estimating Conference* 3 (Nov. 20, 2025), https://perma.cc/4DZW-SN4H.

4. Congress has been clear that CHIP is not an entitlement program. 42 U.S.C. § 1397bb(b)(5). Congress has similarly allowed cost-sharing with CHIP participants, including through required monthly premiums, as well as disenrollment of CHIP participants for nonpayment. *Id.* § 1397cc(e). These are essential features of Florida CHIP, whereby families who enroll at least one child in the program are required to pay a monthly premium to obtain insurance coverage, currently between $15 and $20 total. Ex. 1, State of Florida, *Florida KidCare Program, Amendment FL-22-0034-CHIP* 177 (Mar. 11, 2021) ("*Florida KidCare Program*"). Failure to pay the monthly premium, after a 30-day grace period, results in disenrollment. *Id.* at 22–23, 97–98, 176–78. If a family becomes eligible for a tier with a lower premium due to loss of income, that is also available. *Id.* at 191. These premiums offset program costs, ensure Florida maintains a balanced budget as required by its state constitution, and preserve

Florida CHIP as a bridge between Medicaid and private insurance rather than an entitlement.

5. The Social Security Act also provides a mechanism for States and the federal government to work collaboratively to implement innovative programs that go beyond federal CHIP requirements. Section 1115 of the Social Security Act allows CMS to approve "any experimental, pilot, or demonstration project which … is likely to assist in promoting the objectives" of CHIP and provide federal reimbursement for state expenditures. 42 U.S.C. § 1315(a).

6. In 2024, to fulfill its commitment to CHIP expansion in H.B. 121, Florida sought approval for a demonstration project under section 1115—the Florida Children's Health Insurance Program Eligibility Extension ("Extension Program")—that would increase the family income threshold for subsidized health insurance under CHIP from 210% of the federal poverty level ("FPL") to 300% of the FPL. *See* Ex. 2, *Florida Children's Health Insurance Program Eligibility Extension Request* (Feb. 23, 2024) ("Extension Program Application").[2] The Extension Program would provide access to subsidized health insurance to tens of thousands more Florida children. *Id.* at 7–9. Families who are eligible for

[2] The income thresholds are the modified adjusted gross income (MAGI) values. *See Florida MAGI Conversion Results* (June 27, 2013), https://perma.cc/D58H-KTZU.

coverage and enroll in the Extension Program would be required to pay a monthly premium to obtain insurance, between $60 to $195 depending on household income. *Id.* at 7. Failure to pay the monthly premium, after a 30-day grace period, would result in disenrollment. *See id.* at 9. Indeed, the Florida Legislature authorized the Extension Program on the premise that enrolled participants would pay premiums. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, at 7 (June 23, 2023), https://perma.cc/B8NB-RCPZ; *see also* Fla. Stat. §§ 409.8132(8) ("nonpayment of premiums" is considered "voluntary cancellation"); 624.91(5)(b)(9) (same).

7. On December 2, 2024, CMS notified Florida that it had approved the Extension Program, contingent on various special terms and conditions ("STCs"). Ex. 3, Letter from Chiquita Brooks-LaSure, CMS Adm'r, to Brian Meyer, AHCA Deputy Sec'y for Medicaid (Dec. 2, 2024) ("Brooks-LaSure Letter"), https://perma.cc/8ZYU-4S78; Ex. 4, CMS, *Florida Children's Health Insurance Program Eligibility Extension*, No. 21-W-00076/4 (Dec. 2, 2024) ("Extension Program STCs") (attached to the Brooks-Lasure Letter). As relevant here, STC 5.2 mandated that "[i]ndividuals may not be disenrolled from this demonstration for failure to pay the monthly premium during the individual's 12-month continuous eligibility period." Ex. 4, Extension Program STCs at 10.

8. STC 5.2 is incompatible with the Extension Program and the Social Security Act. The Florida Legislature established the Extension Program (and Florida CHIP) as a personal responsibility program, intended to bridge the gap between families with the lowest incomes who receive no-cost health insurance through Medicaid and families with higher incomes who must obtain insurance on their own. *See* Fla. Stat. §§ 409.812; 409.816(3). Prohibiting disenrollment for failure to pay premiums would, instead, turn the Extension Program into an entitlement, contrary to Title XXI, 42 U.S.C. § 1397bb(b)(5), and in violation of Florida law, *id.* § 409.813(2). Moreover, Florida relies on collected premiums to offset program costs, *Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra*, at 7, and disenrollment for nonpayment of premiums is codified in state law, *see* Fla. Stat. §§ 409.8132(8); 624.91(5)(b)(9).

9. Florida therefore asked CMS to modify STC 5.2 by eliminating the prohibition on disenrollment. Ex. 5, Email from Brian Meyer, AHCA Deputy Sec'y for Medicaid, to Daniel Tsai, CMS Deputy Adm'r and Dir. (Jan. 15, 2025) ("Meyer Email"); Ex. 6, Florida's STC Redline (Jan. 15, 2025).[3] CMS rejected Florida's request, asserting that the agency was legally bound to apply the requirement under section 5112 of the Consolidated Appropriations Act, 2023,

---

[3] Deputy Secretary Meyer attached Florida's STC Redline to his January 15, 2026, email to Deputy Administrator Tsai.

Pub. L. No. 117-328, 136 Stat. 4459, 5940 (2022) ("2023 CAA"). *See* Ex. 7, Letter from Daniel Tsai, CMS Deputy Adm'r and Dir., to Brian Meyer, AHCA Deputy Sec'y for Medicaid (Jan. 17, 2025) ("Tsai Letter").

10. But STC 5.2 is plainly *not* required by the 2023 CAA. The 2023 CAA amended the Social Security Act to mandate that states provide 12 months of "[c]ontinuous [e]ligibility" for children in CHIP and Medicaid. 2023 CAA § 5112, 136 Stat. at 5940 (amending 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K)). By its express terms, the 2023 CAA requires only that a child "remain *eligible* for [CHIP] benefits" during the specified 12-month period, not that a child remain *enrolled* in a CHIP plan. *See* 42 U.S.C. § 1396a(e)(12); 2023 CAA § 5112(a), 136 Stat. at 5940 (emphasis added). Nonetheless, CMS insisted that the 2023 CAA required continuous *enrollment* for the Extension Program. *See* Ex. 3, Brooks-LaSure Letter at 2 & n.3; Ex. 7, Tsai Letter.

11. CMS's interpretation of section 5112 ignores the longstanding distinction between *eligibility* for CHIP benefits and *enrollment* in a CHIP plan, which both Congress and CMS have repeatedly acknowledged. *See, e.g.*, 42 U.S.C. § 1397bb(b)(4) (discussing "barriers to the enrollment" of "eligible" individuals). It also turns CHIP into an entitlement program, contradicting Congress's express direction that nothing in CHIP "provid[es] an individual with an entitlement" to health insurance. *Id.* § 1397bb(b)(5). And it renders

superfluous Congress's explicit allowance for "termination of coverage" for "failure to make a premium payment," which was unchanged by the 2023 CAA. *Id.* § 1397cc(e)(3)(C)(ii)(I).

12. STC 5.2 is inconsistent with the plain meaning of the 2023 CAA and the broader context of Title XXI, and therefore is contrary to law and exceeds CMS's authority. STC 5.2 is also arbitrary and capricious because CMS cannot reasonably impose that requirement based on an incorrect reading of the law, which also undermines the objectives of CHIP by transforming it into an entitlement and impeding Florida's ability to expand access to health insurance for children. *See* 42 U.S.C. § 1315(a) (requiring demonstration projects to "promot[e] the objectives" of CHIP).

13. In addition, on January 8, 2026, AHCA submitted a request to CMS under the Freedom of Information Act, 5 U.S.C. § 552, for any records related to expanding subsidized children's health insurance in Florida, including consideration, approval, and implementation of the Extension Program. CMS failed to timely comply with FOIA in responding to this request. CMS did not issue a determination of whether it would comply, conduct adequate searches, or disclose responsive, non-exempt records in the time required by statute and regulation.

14. For the reasons stated above, this Court should declare that STC 5.2 is unlawful, set it aside, and enjoin Defendants from enforcing it as a condition of the Extension Program. This Court should also declare that Defendants failed to timely respond to AHCA's request for records, as required by FOIA, and order Defendants to immediately do so.

## PARTIES

15. Plaintiff State of Florida is a sovereign State with the authority and responsibility to protect its sovereign interests, its public fisc, and the health, safety, and welfare of its citizens.

16. Plaintiff Florida Agency for Health Care Administration is an agency and arm of the State of Florida. AHCA administers Florida CHIP under Title XXI of the Social Security Act. A critical and substantial component of Florida's mission is disseminating information through the Florida Center for Health Information and Transparency about government activities related to healthcare. *See Florida Center for Health Information and Transparency*, AHCA, https://perma.cc/M88L-PZ46 (visited Feb. 13, 2026).

17. Defendant Centers for Medicare and Medicaid Services is the federal agency that oversees federal approval, oversight, and funding for CHIP. CMS also received the FOIA request at issue.

18. Defendant Mehmet Oz is the Administrator of CMS. He is sued in his official capacity.

19. Defendant U.S. Department of Health and Human Services is the parent federal agency of CMS.

20. Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services. He is sued in his official capacity.

## LEGAL STANDARD

21. The APA "embodies [a] basic presumption of judicial review," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967), and requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, … or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory … authority," *id.* § 706(2)(C).

22. "Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Thus, "as mere creatures of statute," agencies "must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019). Agencies are likewise constrained to implementing the "best reading" of any statute they administer. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

23. Agency action must be "the product of reasoned decisionmaking," which requires "consideration of [all] relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42–43, 52 (1983). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50 (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947)); *see also Hewitt v. Comm'r*, 21 F.4th 1336, 1342 (11th Cir. 2021).

24. FOIA further directs federal agencies to make available non-exempt agency records in response to a request that "reasonably describes such records," and "is made in accordance with published rules stating the time, place, fees … and procedures to be followed." 5 U.S.C. § 552(a)(3)(A); 42 C.F.R. §§ 401.116(a), 401.136; 45 C.F.R. §§ 5.3, 5.24, 5.28.

25. Agencies must respond within 20 working days (i.e., exempting Saturdays, Sundays, and legal public holidays) after receipt of the request, including notifying the requester "immediately" of its determination whether to comply with the request, the reasons therefor, and the right to appeal any adverse determination. 5 U.S.C. § 552(a)(6)(A)(i). CMS regulations further require the agency to determine "whether records will be released or withheld … within 10 working days" of receipt in the appropriate CMS office. 42 C.F.R. § 401.136(b). HHS deems a request "officially receive[d]" when it reaches the appropriate HHS agency or division, "but no later than 10 working days after

the request first arrives at any … FOIA Requester Service Cente[r].” 45 C.F.R. § 5.23(b).

26. In certain circumstances, an agency may provide notice to the requester that “unusual circumstances” merit additional time—up to 10 more working days—to respond. 5 U.S.C. § 552(a)(6)(B)(i)–(ii); *see also* 42 C.F.R. § 401.136(b); 45 C.F.R. § 5.24(f). “Unusual circumstances” include “the need to search for and collect the requested records from field facilities,” “the need to search for, collect, and … examine a voluminous amount of … records,” and “the need for consultation … with another agency” or “among two or more components of the agency having a substantial … interest” in the determination of the request. 5 U.S.C. § 552(a)(6)(B)(iii); 42 C.F.R. § 401.136(b). To invoke the extension, CMS must notify the requester “in writing before the expiration of 10 working days from receipt of the request” and “giv[e] an explanation of why the extension was necessary and the date on which a determination will be made.” 42 C.F.R. § 401.136(c); *see also* 5 U.S.C. § 552(a)(6)(B)(i); 45 C.F.R. § 5.24(f).

27. If an agency provides notice to the requester of “unusual circumstances” and is unable to respond within the statutory deadline, the agency must provide the requester “an opportunity to arrange with the agency an alternative

time frame for processing the request." 5 U.S.C. § 552(a)(6)(B)(ii); 45 C.F.R. § 5.24(f).

28. An agency is generally prohibited from "assess[ing] any search fees … if the agency has failed to comply with" the statutory deadlines. 5 U.S.C. § 552(a)(4)(A)(viii)(I).

## JURISDICTION AND VENUE

29. This Court has jurisdiction under 5 U.S.C. §§ 701–706, 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. §§ 1331 and 2201.

30. This Court may grant declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

31. Under the APA, any "final agency action" is subject to judicial review, and the United States has waived sovereign immunity so long as the plaintiff seeks only non-monetary relief. 5 U.S.C. §§ 702, 704; *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1555 (11th Cir. 1985).

32. Agency action is "final" when it "mark[s] the consummation of the agency's decisionmaking process," and determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

33. STC 5.2 is a final agency action because it represents the consummation of CMS's decisionmaking process related to Florida's Extension Program under section 1115 of the Social Security Act, and imposes binding legal obligations on Florida in its implementation of that Program. *See* Ex. 7, Tsai Letter (explaining CMS's final decision). District courts have consistently held they have jurisdiction to review CMS determinations related to section 1115 demonstration projects. *See, e.g.*, *Georgia v. Brooks-LaSure*, No. 2:22-cv-6, 2022 WL 3581859, at *10 (S.D. Ga. Aug. 19, 2022); *Texas v. Brooks-LaSure*, No. 6:21-cv-191, 2021 WL 5154219, at *7 (E.D. Tex. Aug. 20, 2021); *Gresham v. Azar*, 363 F. Supp. 3d 165, 173–74 (D.D.C. 2019), *aff'd*, 950 F.3d 93, 98–99 (D.C. Cir. 2020), *vacated as moot*, *Arkansas v. Gresham*, 142 S. Ct. 1665 (2022).

34. Florida has standing to challenge STC 5.2 because it impedes the State's ability to implement H.B. 121, which provides for expanding Florida CHIP to provide access to subsidized health insurance to more children in the State, and imposes significant financial costs on the State. STC 5.2 also injures Florida's sovereign interests by impeding its ability to enforce state law, which requires disenrollment for nonpayment of premiums. *See* Fla. Stat. §§ 409.8132(8), 624.91(5)(b)(9). Indeed, as the "object" of CMS's action, there is "little question" that Florida has standing to challenge it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

35. Florida is deemed to have exhausted its administrative remedies and may immediately pursue judicial review of its FOIA claims because CMS did not respond within the statutory and regulatory deadlines. 5 U.S.C. § 552(a)(6)(C)(i); 42 C.F.R. §§ 401.148(b), 401.152. Florida has standing to seek withheld federal records because CMS did not timely respond to its FOIA request. *Public Citizen v. F.T.C.*, 869 F.2d 1541, 1549 n.13 (D.C. Cir. 1989) ("Plaintiffs who bring actions under [FOIA] … have standing merely by virtue of the fact that they have been denied information they have requested.").

36. Venue is proper under 28 U.S.C. § 1391(e)(1)(C) and 5 U.S.C. § 552(a)(4)(B) because an agency of the United States is a defendant, and Florida is a resident of every judicial district and division in its sovereign territory, including this judicial district and division. *See Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022) ("It is well established that a state 'resides at every point within its boundaries.'" (cleaned up) (quoting *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892))); *see also California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018) ("[A] state with multiple judicial districts 'resides' in every district within its borders."); *Utah v. Walsh*, No. 2:23-cv-16, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023) ("Texas resides everywhere in Texas."); *Alabama v. U.S. Army Corps of*

*Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) ("[C]ommon sense dictates that a state resides throughout its sovereign borders[.]").

37. Because the State of Florida resides in every judicial district in the State, assignment to this Division is proper under Local Rule 3.1.

## FACTUAL BACKGROUND

***Children's Health Insurance Program (CHIP)***

38. In 1997, Congress established CHIP under Title XXI of the Social Security Act to offer health insurance to "targeted low-income children" and certain other uninsured individuals who do not qualify for health insurance under Medicaid. 42 U.S.C. §§ 1397aa–1397bb. CHIP is designed as a cooperative effort between States and the federal government. Each State develops and administers its own CHIP plan, and the federal government provides supplemental funding to help defray program costs. *See id.* §§ 1397aa–1397mm.

39. A state CHIP plan must generally comply with federal standards to receive funding. *Id.* § 1397ff(a), (d)(2). States submit their CHIP plans to CMS for approval and must operate their programs consistent with an approved plan. *Id.* § 1397ff(a)(1), (d)(1).

40. States have considerable flexibility to design CHIP plans that best serve their residents. For example, Title XXI permits States to select the

standards they use "to determine the eligibility of targeted low-income children," including standards "relating to the geographic areas to be served by the plan, age, income and resources … , residency, disability status (so long as any standard relating to such status does not restrict eligibility), access to or coverage under other health coverage, and duration of eligibility." *Id.* § 1397bb(b)(1)(A); 42 C.F.R. § 457.320(a). States may not, however, impose eligibility standards that "cover … children with higher family income without covering children with a lower family income," "deny eligibility based on … a preexisting medical condition," or "apply a waiting period" for certain specified coverage. 42 U.S.C. § 1397bb(b)(1)(B); 42 C.F.R. § 457.320(b).

41. A child determined to be *eligible* for benefits may then *enroll* to obtain health insurance coverage under the state CHIP plan. *See, e.g.*, 42 U.S.C. § 1397cc(e)(3)(C)(i) (discussing "individuals *enrolled* under the plan" (emphasis added)). State CHIP plans must provide participants with certain baseline insurance coverage, including coverage for basic health services, mental health services, and dental services. *Id.* § 1397cc(a), (c).

42. Title XXI also allows States to require cost-sharing by participants, including by charging "premiums, deductibles, [and] coinsurance" for certain covered health services. *Id.* § 1397cc(e)(1)(A). Federal regulations detail state obligations related to "Enrollee Financial Responsibilities," including

disclosure requirements and limitations on charges. 42 C.F.R. pt. 457, subpt. E. And Congress has expressly stated that "[n]othing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan." 42 U.S.C. § 1397bb(b)(5).

43. Once enrolled in a state CHIP plan, participants are entitled to certain "[d]isenrollment protections," including receiving "reasonable notice of and an opportunity to pay past due" amounts and "an opportunity for an impartial review to address disenrollment," and prohibiting States from requiring payment of "past due premiums … as a condition of … reenrollment." 42 C.F.R. § 457.570; *see* 42 U.S.C. § 1397cc(e)(C)(ii). When a State elects to require cost-sharing, Congress has allowed the State to "terminat[e]" an enrollee's "coverage" for nonpayment after a 30-day grace period. *Id.* § 1397cc(e)(3)(C)(i).

***Section 1115 Demonstration Projects***

44. The Social Security Act provides an additional mechanism for States and the federal government to work collaboratively to implement innovative CHIP plans. Section 1115 allows the Secretary of HHS to approve "any experimental, pilot, or demonstration project which, … is likely to assist in promoting the objectives" of CHIP. 42 U.S.C. § 1315(a); *see id.* § 1315(d)(1) (recognizing demonstration projects are permissible under CHIP); 42 C.F.R.

§ 431.400(a)(1) (same). The Secretary has largely delegated this authority to the Administrator of CMS. 42 C.F.R. pt. 431, subpt. G.

45. Congress enacted section 1115 to ensure that federal requirements do not "stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S. Rep. No. 87-1589, at 19 (1962), *as reprinted in* 1962 U.S.C.C.A.N. 1943, 1961. Section 1115 therefore permits CMS "to relax the usual state-plan-approval requirements" by waiving federal requirements. *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 224 (5th Cir. 2019). As a result, such "§ 1115 demonstration projects [can] provide benefits to people who wouldn't otherwise be eligible for [CHIP] benefits; and the costs of these benefits are treated as if they are matchable [CHIP] expenditures." *Id.*

46. To obtain authorization for a section 1115 demonstration project, a State must "file an application with CMS and comply with various statutory and regulatory requirements." *Texas*, 2021 WL 5154219, at *1; *see* 42 U.S.C. § 1315(d); 42 C.F.R. pt. 431, subpt. G. For example, the application must include a "comprehensive program description of the demonstration, including the goals and objectives," as well as estimates of the expected impact on enrollment and expenditures. 42 C.F.R. § 431.412(a)(1). The application process also includes two opportunities for public input. "First, before submitting [its]

application to CMS, the State must conduct a 30-day notice-and-comment period at the state level, along with at least two public hearings to allow citizens and relevant stakeholders to provide their input." *Texas*, 2021 WL 5154219, at *1 (citing 42 C.F.R. § 431.408); *see also* 42 U.S.C. § 1315(d)(2)(A). Second, after CMS receives the State's application, it must "solicit public comment in a federal notice-and-comment period." *Texas*, 2021 WL 5154219, at *1 (citing 42 C.F.R. § 431.416); *see also* 42 U.S.C. § 1315(d)(2)(C). CMS then approves or denies the project. 42 U.S.C. § 1315(d)(1); 42 C.F.R. § 431.412. If approved, the State may implement its demonstration project and obtain federal reimbursement, subject to periodic reporting and evaluations. 42 U.S.C. § 1315(a)(2), (d)(2)(D)–(E); 42 C.F.R. §§ 431.420, 431.424, 431.428.

***Florida Applies to Extend CHIP Eligibility Under Section 1115***

47. Florida has been providing subsidized health insurance for uninsured children since the early 1990s. When Congress established CHIP in 1997, it expressly grandfathered the Florida program, permitting the State to continue its program as part of CHIP and giving the State discretion to modify its program within broad limits. 42 U.S.C. § 1397cc(a)(3), (d)(1); 42 C.F.R. § 457.440. Florida CHIP is now administered as part of "Florida KidCare," an umbrella program that oversees both Florida Medicaid and CHIP.

48. Generally, Florida CHIP offers subsidized health insurance

coverage to children ages 1 through 18 who are not eligible for free coverage under Medicaid and whose household incomes are up to 210% of the FPL. Children must also meet other criteria to be eligible for Florida CHIP. For example, the child must be a U.S. citizen or qualified alien, a Florida resident, and uninsured at the time of application. Ex. 1, *Florida KidCare Program* at 80–84, 86. If a child is determined to meet the eligibility criteria for participation in Florida CHIP, the child's family is notified and invited to enroll the child in the program. *Id.* at 5, 29–30. As of November 2025, Florida CHIP provided subsidized health insurance coverage to nearly 150,000 Florida children. Florida KidCare, *Caseload Social Services Estimating Conference*, *supra*, at 3.[4]

49. Consistent with state and federal law, Florida CHIP has always required cost-sharing. Families who elect to enroll at least one child in the program are required to pay a modest monthly premium to obtain insurance coverage, at a rate that scales with family income. Currently, families with incomes up to 158% of the FPL pay a monthly premium of $15 total per family, and families with incomes above 158% and up to 210% of the FPL pay a monthly premium of $20 total per family. The monthly premiums are the same

[4] Families that do not qualify for coverage under CHIP or Medicaid are also eligible to purchase health insurance for children through Florida KidCare, but they are required to pay the full premium cost. Ex. 1, *Florida KidCare Program* at 5, 177.

regardless of the number of children in the family enrolled. Ex. 1, *Florida KidCare Program* at 22–23, 176–77.

50. The Florida Constitution requires balanced annual budgets. Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d). Premium payments help offset the costs of Florida CHIP and play an important role in achieving the constitutional requirement and maintaining the long-term stability of Florida CHIP.

51. Requiring participants to make modest contributions to the cost of health insurance also reflects a conscious policy choice by the Florida Legislature, which concluded that Florida residents are best-served when those eligible for state-subsidized healthcare retain a measure of accountability for, and investment in, the benefits they receive. Florida CHIP is a personal responsibility program, intended to bridge the gap between families with the lowest incomes who receive no-cost health insurance through Medicaid, and families with higher incomes who must obtain insurance on their own. *See* Fla. Stat. § 409.812 (Florida CHIP provides "health benefits coverage options from which families may select coverage and through which families may contribute financially to the health care of their children"); *id.* § 409.813(2) ("[C]overage under the Florida Kidcare program is not an entitlement."); Staff of Florida H.R. Health Care Servs. Comm., *Review of the Implementation of the Florida KidCare Act* 7–8 (Sept. 1999), https://perma.cc/A8TU-9HJM (explaining Florida CHIP's

"goal" is to "mak[e] affordable health care coverage available to low and moderate income children in Florida … in a manner which treats low and moderate income Floridians as customers, maximizing participants' sense of personal responsibility and self-worth by allowing them to contribute financially to the health care of their children via premiums and copayments").

52. In June 2023, Governor DeSantis signed into law Florida H.B. 121, which makes Florida children with household incomes up to 300% of the FPL eligible for subsidized insurance through Florida CHIP. *See* H.B. 121, § 1. The increased income limit in this Extension Program would make subsidized health insurance available to tens of thousands of additional Florida children in its first full year of operation alone. *Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra*, at 5.

53. Like Florida CHIP, the Extension Program would be supported partially through state funds, with the remaining costs covered through the collection of premium payments and matching federal funds. *Id.* at 6–7. Premiums for those already eligible for the existing Florida CHIP would adjust slightly. Families with incomes between 133% and 175% of the FPL would pay $17 per month, and families with incomes between 175% and 210% of the FPL would pay $30 per month. Ex. 2, Extension Program Application at 7. Newly

eligible families with higher incomes would pay premiums ranging from $60 to $195 per month, depending on family income. *Id.*

54. The Florida Legislature projected that once the Extension Program is implemented, annual premium collections would increase from approximately $24 million (in the existing Florida CHIP) to about $37 million in the first year of the Extension Program, and could more than double once the Extension Program is in full effect. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra*, at 7. These premiums help offset the substantially increased costs associated with subsidizing health insurance for more children under the Extension Program. *See id.*

55. Because the Extension Program provides access to subsidized health insurance for children whose family incomes exceed 210% of the FPL and relies on federal matching funds, *see* 42 U.S.C. § 1397jj(c)(4), Florida required authorization under section 1115 to implement it. *Id.* § 1315(a); Ex. 2, Extension Program Application at 10. Accordingly, Florida followed the application process set forth by regulation. 42 C.F.R. pt. 431, subpt. G.

56. On January 23, 2024, Florida published notice of its application for the Extension Program for public review at the state level and subsequently held public hearings. *See* AHCA, *Children's Health Insurance Program Eligibility Extension Full Public Notice* 4 (Jan. 23, 2024), https://perma.cc/ECU2-M2NF.

57. On February 23, 2024, Florida submitted its application to HHS. Ex. 2, Extension Program Application.

58. On March 28, 2024, CMS acknowledged that Florida's application was complete and posted it on Medicaid.gov for a 30-day federal comment period. Letter from Lisa Marunycz, CMS Deputy Dir. for Div. of Sys. Reform Demonstrations, to Tom Wallace, AHCA Deputy Sec'y for Health Care Fin. & Data (Mar. 28, 2024), https://perma.cc/R3NV-HF48.

***CMS Prohibits Disenrollment in the Extension Program Because of the 2023 CAA***

59. On December 2, 2024, CMS notified Florida that it had approved the Extension Program as a section 1115 demonstration project, contingent on compliance with various STCs. Ex. 3, Brooks-LaSure Letter at 4; Ex. 4, Extension Program STCs.

60. Compliance with many of the STCs is straightforward. For example, STC 3.1 requires Florida to "comply with all applicable federal statutes relating to non-discrimination," which it already intends to do. Ex. 4, Extension Program STCs at 4. Other STCs specified requirements for amending, extending, or phasing-out the Extension Program. *See id.* at 4–7 (STCs 3.5–3.9).

61. Compliance with one STC, however, undermines Florida's ability to implement the Extension Program. STC 5.2 provides that "[i]ndividuals may not be disenrolled from this demonstration for failure to pay the monthly

premium during the individual's 12-month continuous eligibility period." *Id.* at 10. The payment of modest premiums to offset the cost of subsidized health insurance was a foundational assumption in Florida's expansion of CHIP under H.B. 121. *Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra*, at 7 (funding for expansion includes family contributions). Payment of premiums is also essential to the character of Florida CHIP and the Extension Program as a bridge between Medicaid and private insurance rather than an entitlement program, *see* Fla. Stat. §§ 409.812, 409.813(2); *Review of the Implementation of the Florida KidCare Act*, *supra*, at 7–8, and disenrollment for nonpayment is required by state law, *see* Fla. Stat. §§ 409.8132(8), 624.91(5)(b)(9).

62. In its letter, CMS stated that the 2023 CAA "prohibits disenrollment of the expansion population for nonpayment of premiums during the 12-month continuous eligibility period" and that "CMS would impose the same condition … as a matter of policy." Ex. 3, Brooks-LaSure Letter at 2.

63. On January 15, 2025, Florida asked to modify STC 5.2 to remove the prohibition on disenrollment for failure to pay the monthly premium. *See* Ex. 5, Meyer Email; Ex. 6, Florida's STC Redline. Florida explained that the changes were necessary for the Extension Program to comply with Florida law, and so would allow the Florida to move forward with implementing the program. Ex. 5, Meyer Email.

64. On January 17, 2025, CMS notified Florida that it had rejected its modification because "it does not comply with the statute and implementing regulations for continuous eligibility for children," citing the 2023 CAA and related regulations. Ex. 7, Tsai Letter. CMS underscored that to implement the demonstration and receive federal funds, Florida "must comply with these STCs in full, including STC 5.2." *Id.*

***CMS's Flawed Interpretation of the 2023 CAA***

65. The lawfulness of STC 5.2 thus hinges on whether CMS correctly interpreted the 2023 CAA to prohibit disenrollment for failure to pay premiums during periods of continuous eligibility. *See* Ex. 7, Tsai Letter. As explained below, it does not.

66. In December 2022, Congress enacted section 5112 of the 2023 CAA, which amended the Social Security Act to require that States provide 12 months of "[c]ontinuous [e]ligibility" as part of CHIP and Medicaid for children. 2023 CAA § 5112, 136 Stat. at 5940 (amending 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K)). Section 5112 states that "an individual who is under the age of 19 and who is determined to be eligible for benefits" under CHIP or Medicaid "shall remain eligible for such benefits" for 12 months following the eligibility determination, or until the individual "attains the age of 19" or moves out-of-state, effective January 1, 2024. *Id.*

67. Prior to the 2023 CAA, States had the option of providing CHIP participants with a period of continuous eligibility under CMS regulations. 42 C.F.R. § 457.342(a) (2024). Congress had offered States a similar continuous eligibility option by statute for Medicaid. *See* 42 U.S.C. § 1396a(e)(12) (2023).

68. CMS regulations similarly specified that if a State offers continuous eligibility as part of CHIP or Medicaid, "[a] child's eligibility may not be terminated during a continuous eligibility period, regardless of any changes in circumstances, unless:

> (1) The child attains the maximum age … ;
>
> (2) The child or child's representative requests a voluntary termination of eligibility;
>
> (3) The child ceases to be a resident of the State;
>
> (4) The agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative; or
>
> (5) The child dies."

42 C.F.R. § 435.926(d) (2024) (emphasis added); *see id.* § 457.342(b) (2023).

69. Recognizing that eligibility for CHIP benefits is not the same as enrollment in a CHIP plan and that Title XXI expressly allows disenrollment for nonpayment of premiums, CMS further provided by regulation that a CHIP participant "may be terminated during the continuous eligibility period for

failure to pay required premiums or enrollment fees required under the State plan, subject to the disenrollment protections afforded under [42 U.S.C. § 1397cc(e)(3)(C)] (related to premium grace periods) and [42 C.F.R.] § 457.570 (related to disenrollment protections)." *Id.* § 457.342(b) (2024).

70. The 2023 CAA made continuous eligibility mandatory for both CHIP and Medicaid. Specifically, the 2023 CAA amended section 1902(e)(12) of the Social Security Act, 42 U.S.C. § 1396a(e)(12), applicable to Medicaid, to read:

> The State plan (or waiver of such State plan) shall provide that an individual who is under the age of 19 and who is determined to be eligible for benefits under a State plan (or waiver of such plan) approved under this subchapter under subsection (a)(10)(A) shall remain eligible for such benefits until the earlier of—
>
> (A) the end of the 12-month period beginning on the date of such determination;
>
> (B) the time that such individual attains the age of 19; or
>
> (C) the date that such individual ceases to be a resident of such State.

2023 CAA § 5112(a), 136 Stat. at 5940.

71. The 2023 CAA then amended section 2107(e)(1) of the Social Security Act, 42 U.S.C. § 1397gg(e)(1), to provide that the Medicaid mandatory

continuous eligibility provision also applies to state CHIP plans. 2023 CAA § 5112(b), 136 Stat. at 5940 (adding 42 U.S.C. § 1397gg(e)(1)(K)).[5]

72. Congress has previously considered bills that would provide for both continuous eligibility *and enrollment* in a state CHIP plan. *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021); Stabilize Medicaid and CHIP Coverage Act, H.R. 1738, 117th Cong. (2021). Those bills contained express language requiring that "an individual who is determined to be eligible for benefits … shall remain eligible *and enrolled* for such benefits" for the duration of the specified period. S. 646, § 3(b)(1) (emphasis added); H.R. 1738, § 2(b)(1) (same). But Congress passed section 5112 of the 2023 CAA instead, which includes no reference to CHIP enrollment or coverage.

73. Despite the 2023 CAA's plain language requiring eligibility, not enrollment, CMS concluded in STC 5.2 that the 2023 CAA required States to provide 12 months of continuous enrollment—and thus guaranteed coverage—for CHIP participants, and so prohibited disenrollment for failure to pay premiums. Ex. 3, Brooks-LaSure Letter at 2 & nn.2–3; Ex. 7, Tsai Letter.

---

[5] The 2023 CAA also provides that "a targeted low-income child enrolled under the State child health plan or waiver may be transferred to the Medicaid program … for the remaining duration of the 12-month continuous eligibility period, if the child becomes eligible for full [Medicaid] benefits … during such period." 2023 CAA § 5112(b), 136 Stat. at 5940; 42 U.S.C. § 1397gg(e)(1)(K).

74. CMS originally explained its interpretation of the 2023 CAA in a State Health Official letter and follow-on "Frequently Asked Questions" document issued in late 2023. *See* CMS, SHO #23-004, *Section 5112 Requirement for All States to Provide Continuous Eligibility to Children in Medicaid and CHIP Under the Consolidated Appropriations Act, 2023* (Sept. 29, 2023), https://perma.cc/532Z-GQHZ; CMS, *Mandatory Continuous Eligibility for Children in Medicaid and CHIP: Frequently Asked Questions* ("FAQs") (Oct. 27, 2023), https://perma.cc/PX4L-8Z5W. The FAQs made clear that States would have to cover the cost of any unpaid premiums, since those amounts are not eligible for federal reimbursement. FAQs at 2.

75. On November 27, 2024, CMS promulgated a Final Rule implementing the 2023 CAA, effective January 1, 2025. 89 Fed. Reg. 93912, 94462–67 (Nov. 27, 2024). The Final Rule amended 42 C.F.R. § 457.342 to require that a "State must provide continuous eligibility for children under a separate CHIP," and rescinded 42 C.F.R. § 457.342(b) (2024), which had previously recognized a State's ability to disenroll CHIP participants for nonpayment of premiums during the continuous eligibility period. 89 Fed. Reg. at 94591. The Rule's preamble explained CMS's view that the 2023 CAA "requires that once enrolled in coverage and the continuous eligibility period

begins, States may not disenroll individuals from coverage due to nonpayment of premiums during the continuous eligibility period." *Id.* at 94466.

76. CMS justified its interpretation by arguing that the 2023 CAA specifies the 12-month period of continuous eligibility applies to CHIP "in the same manner" as it applies to Medicaid. *Id.* at 94465 (quoting 42 U.S.C. § 1397gg(e)(1). Because "termination of coverage for nonpayment of premiums is not permitted during periods of continuous eligibility under Medicaid," CMS insisted that termination of coverage (i.e., disenrollment) is not permitted under CHIP, either. *Id.*

77. CMS cited the Final Rule and invoked the same reasoning to justify STC 5.2. *See* Ex. 3, Brooks-LaSure Letter at 2 n.3; Ex. 7, Tsai Letter.

78. CMS's interpretation of the 2023 CAA is not the "best reading" because it defies the plain meaning of the statute and is inconsistent with the broader Title XXI context. *Loper Bright*, 603 U.S. at 400. CMS conflates *eligibility* for CHIP benefits with *enrollment* in a CHIP plan, a distinction both Congress and CMS have long recognized. *See, e.g.*, 42 U.S.C. § 1397bb(b)(4) (discussing "barriers to the enrollment" of "eligible" individuals). It would also turn CHIP into an entitlement program—guaranteeing health insurance coverage, not just eligibility for subsidized coverage—contradicting Congress's express direction that nothing in CHIP "provid[es] an individual with an entitlement" to

insurance. *Id.* § 1397bb(b)(5). And it would render superfluous Congress's explicit allowance for "termination of coverage" for "failure to make a premium payment," which was unchanged by the 2023 CAA. *Id.* § 1397cc(e)(3)(C)(ii)(I).[6]

***STC 5.2 Has Serious Consequences for Florida***

79. STC 5.2 has serious consequences for Florida and its Extension Program.

80. Since January 2005, Florida CHIP has provided 12 months of "continuous eligibility" for participants. Ex. 1, *Florida KidCare Program* at 83, 91–92.[7] During the continuous eligibility period, a child remains eligible for subsidized health insurance regardless of changes in the child's circumstances, with limited exceptions. This means that even if the child's household income increases above the income limit during the relevant period, the child retains access to health insurance through Florida CHIP with no change in monthly premiums for 12 months, measured from the first month of coverage or the month following the date the participant completed renewal. *Id.*

[6] Florida has previously challenged CMS's FAQs and final rule implementing continuous eligibility under the 2023 CAA. *See Florida v. CMS*, No. 8:24-cv-317, 2024 WL 2803298 (M.D. Fla. May 31, 2024); *Florida v. CMS*, No. 8:25-cv-36 (M.D. Fla. filed Jan. 7, 2025). Neither suit involved STC 5.2 or resolved the correct interpretation of the 2023 CAA.

[7] From 1998 to 2005, Florida CHIP provided six months of continuous eligibility. Ex. 1, *Florida KidCare Program* at 83, 91–92.

81. Payment of monthly premiums, however, is required to maintain enrollment in Florida CHIP and obtain health insurance coverage, but not to maintain underlying eligibility. A participant whose family does not pay the monthly premium is disenrolled from insurance coverage after a 30-day grace period regardless of eligibility. *Id.* at 97. The participant can, however, re-enroll without going through a new eligibility application and determination. *Id.* at 98.

82. Accordingly, for decades, 12 months of continuous eligibility and disenrollment for nonpayment of premiums have coexisted comfortably in Florida CHIP. This has provided participants with stability, while ensuring that Florida CHIP remains a personal responsibility program, as intended by the Florida Legislature. *See* Fla. Stat. §§ 409.812, 409.813(2). It has also ensured that Florida CHIP complies with state law requiring disenrollment for failure to pay premiums, *see id.* §§ 409.8132(8), 624.91(5)(b)(9), and played an important role in achieving a balanced state budget as required by the state constitution, *see* Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d).

83. Participants in the Extension Program would similarly be provided 12 months of continuous eligibility and subject to the same disenrollment for nonpayment provisions. Ex. 2, Extension Program Application at 9. The Extension Program also embraces the same policy of personal responsibility, *see id.* at 3–4, and is subject to the same state laws and constitutional provisions

requiring disenrollment for failure to pay premiums and a balanced budget. Indeed, the Extension Program was based on the assumption that enrolled participants would pay premiums. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra*, at 7.

***CMS Fails to Timely Respond to AHCA's FOIA Request***

84. On January 8, 2026, AHCA submitted a FOIA request to CMS through FOIA.gov, seeking any CMS records related to expanding subsidized children's health insurance in Florida, including records related to consideration, approval, or implementation of the Extension Program. *See* Ex. 8, FOIA Request. Florida's ongoing efforts to expand healthcare coverage for children are a matter of public debate, and therefore the records are of immediate interest to the public.

85. Specifically, AHCA requested:

A. Records related to expanding subsidized children's health insurance in Florida. *Id.* at 1.

B. Records related to the Florida CHIP Extension Program, including, but not limited to, records related to the demonstration project application, public comments on the application, approval of the demonstration project, or the special terms and conditions for the demonstration project. *Id.*

C. Records related to communication with any individual outside of CMS related to the Florida CHIP Extension Program, including, but not limited to, any communications related to the demonstration project application, public comments on the application, approval of the demonstration project, or the special terms and conditions for the demonstration project. *Id.* at 1–2.

86. AHCA included in the request relevant information to guide the search and confined the scope of any responsive records to a limited period, from June 22, 2023, through the date of production. *Id.* at 1.

87. AHCA requested expedited processing because of its role in "disseminating information" related to healthcare to the Florida public and the "urgency to inform the public concerning … Federal Government activity." *Id.* at 2; *see* 5 U.S.C. § 552(a)(6)(E)(v)(II); 45 C.F.R. § 5.27(b)(2). AHCA requested expedited processing for the additional reason that the special terms and conditions imposed by CMS have impeded Florida's ability to implement its Extension Program. Ex. 8, FOIA Request at 2.

88. AHCA further committed to "disseminate any information obtained through this request to the public, contributing to the public's enhanced understanding" of state and federal government activities. *Id.* And Florida

sought a fee waiver because the records are "likely to contribute significantly to public understanding of [CMS's] operations," and the request "is not primarily in [Florida's] commercial interest." *Id.*; *see* 5 U.S.C. § 552(a)(4)(A)(iii); 45 C.F.R. § 5.54.

89. That same day, AHCA received a receipt acknowledging submission of the request. *See* Ex. 9, FOIA Request Receipt. The receipt included an internal control number for the request and explained that AHCA would "hear back" from CMS "in the coming weeks." *Id.* at 1.

90. AHCA received no further response from CMS related to the FOIA request until February 11, 2026, after Florida filed this suit. *See* Ex. 10, Email from CMS FOIA Service Center to Andrew Sheeran, AHCA Gen. Counsel (Feb. 11, 2026) ("CMS FOIA Confirmation"); Compl. (filed Feb. 9, 2026), Dkt. 1. The email again confirmed receipt of the FOIA request at "one of CMS's FOIA processing offices on 01/08/2026." CMS FOIA Confirmation at 1.

91. CMS has failed to satisfy its obligations under FOIA. Federal agencies must determine within 20 working days whether they will comply with a FOIA request and immediately notify the requester. 5 U.S.C. § 552(a)(6)(A)(i). CMS still has not made that determination.

92. CMS has similarly failed to satisfy its regulatory obligations. CMS must determine "whether records will be released or withheld … within 10

working days" of receipt in the appropriate CMS office. 42 C.F.R. § 401.136(b). A request is deemed received "no later than 10 working days after the request first arrives at any … FOIA Requester Service Cente[r]." 45 C.F.R. § 5.23(b). CMS still has not made that determination.

93. Nor has CMS provided any responsive records or explained that responsive records have been or will be withheld.

94. CMS has also failed to respond to AHCA's request for expedited processing, although its inaction acts as constructive denial. And CMS has not notified AHCA that unusual circumstances warrant a 10-day extension. 5 U.S.C. § 552(a)(6)(B); 42 C.F.R. § 401.136(b), (c).

95. Because CMS did not respond to the FOIA request by the statutory or regulatory deadlines, Florida is deemed to have exhausted administrative remedies and is entitled to immediately pursue judicial review. 5 U.S.C. § 552(a)(6)(C)(i); 42 C.F.R. §§ 401.148(b), 401.152.

***Florida is Entitled to Relief***

96. By unlawfully imposing STC 5.2, CMS has impeded Florida's ability to implement its Extension Program and provide access to subsidized health insurance to tens of thousands more Florida children. This Court should therefore declare that STC 5.2 is unlawful, set it aside, and enjoin Defendants from enforcing STC 5.2 as a condition of the Extension Program.

97. By failing to timely respond to AHCA's request for records, CMS has violated FOIA. This Court should therefore also declare that Defendants failed to timely respond to AHCA's request for records, as required by FOIA, and order Defendants to immediately do so. Florida requests that the Court expedite this action under 28 U.S.C. § 1657(a), which provides that the Court "shall expedite the consideration of … any other action if good cause therefor is shown," including for "rights under section 552 of title 5," i.e., FOIA. Good cause exists to expedite this action because the records requested are relevant to Florida's ongoing efforts to expand healthcare coverage for children, which is a matter of public debate, and therefore of immediate interest to the public.

## CLAIMS FOR RELIEF

## COUNT ONE

## (Violation of the APA: Contrary to Law)

98. The allegations in paragraphs 1–23, 29–34, 36–83, 96 are expressly incorporated herein as if restated in full.

99. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

100. Statutes "do—in fact, must—have a single, best meaning." *Loper Bright*, 603 U.S. at 400. Courts must "use every tool at their disposal to determine the best reading of the statute." *Id.* An "agency's action must be

upheld, if at all, on the basis articulated by the agency itself." *Hewitt*, 21 F.4th at 1342 (quoting *State Farm*, 463 U.S. at 50)). CMS maintained STC 5.2 as a condition on the Extension Program because it claimed that doing so was required to comply with the 2023 CAA. Ex. 7, Tsai Letter. Because STC 5.2 is not the best reading of the 2023 CAA, the condition is "not in accordance with law" and must be set aside. 5 U.S.C. § 706(2)(A).

101. It is a "fundamental principle" that statutory construction begins by considering "the language of the statute itself, … giv[ing] effect to the plain terms of the statute." *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021) (cleaned up). The 2023 CAA provides that a child "who is determined to be eligible for benefits under" a state CHIP plan "shall remain eligible for such benefits" for 12 months, unless the child reaches age 19 or ceases to be a state resident. 2023 CAA § 5112(a), (b), 136 Stat. at 5940; 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K).

102. To be "eligible" means to be "qualified to participate or be chosen." *Eligible*, Merriam-Webster, https://perma.cc/WAG9-6HGP (visited Feb. 13, 2026). A child is eligible for CHIP benefits if the child meets the relevant state-established criteria. 42 U.S.C. § 1397bb(b)(1). For CHIP and related demonstration projects under section 1115, eligibility criteria generally include having a household income that does not exceed a specified limit, being a U.S.

citizen or qualified alien, being a state resident, and being uninsured. *See id.*; 42 C.F.R. § 457.320.

103. Accordingly, the "plain and ordinary meaning" of the 2023 CAA is that once a child is determined to be eligible for CHIP benefits, a State cannot reconsider that eligibility for CHIP benefits for an entire year, except for the reasons specified by statute. *Chinchilla*, 987 F.3d at 1308; *see* 2023 CAA § 5112(a), (b), 136 Stat. at 5940; 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K).

104. STC 5.2 misreads the 2023 CAA to require continuous *enrollment*—or, as CMS has elsewhere described it, continuous *coverage*. *See* 89 Fed. Reg. at 94462; Ex. 3, Brooks-LaSure Letter at 2 n.3 (citing 89 Fed. Reg. 93912). The 2023 CAA says nothing about continuous enrollment in or coverage by a CHIP plan. To "enroll" means to "insert, register, or enter in a list, catalog, or roll." *Enroll*, Merriam-Webster, https://perma.cc/8ZCC-VS5J (visited Feb. 13, 2026). Children determined *eligible* for CHIP benefits are then offered the option to *enroll* in a CHIP plan. Once enrolled in CHIP, a child obtains health insurance coverage. Enrollment and coverage may require additional steps, such as paying an enrollment fee and monthly premiums. *See, e.g.*, 42 C.F.R. § 457.510. The 2023 CAA provides only for a period of uninterrupted "eligibility," not uninterrupted "enrollment" or "coverage." *See* 2023 CAA § 5112(a), (b), 136 Stat. at 5940; 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K).

105. The fact that continuous eligibility "shall apply to States under" CHIP "in the same manner as" it applies "to a State under" Medicaid does not change the meaning or consequences of CHIP eligibility. *Contra* Ex. 3, Brooks-LaSure Letter at 2 & nn.2–3. It simply means that in CHIP, as in Medicaid, a State cannot initiate a "re-determination of eligibility based on a change in the [participant's] circumstances during the [continuous eligibility] period." 89 Fed. Reg. at 94463.

106. CMS's reading of the 2023 CAA in STC 5.2 is also inconsistent with statutory context. "[R]easonable statutory interpretation must account for both 'the specific context in which … language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014). Statutory context confirms that the 2023 CAA requires only that a child remain eligible for CHIP benefits, not enrolled in a CHIP plan.

107. Title XXI consistently distinguishes eligibility for CHIP benefits from enrollment in a CHIP plan that provides coverage. *See, e.g.*, 42 U.S.C. § 1397bb(b)(4) (discussing "barriers to the enrollment" of "eligible" individuals); *id.* § 1397hh(c)(3) ("enrollees, disenrollees, and individuals eligible for but not enrolled" in a CHIP plan); *id.* § 1397mm(a)(1) ("efforts … to increase the enrollment … of eligible children"); *id.* § 1397mm(h)(1) ("campaigns to link the

eligibility and enrollment systems"); *id.* § 1397mm(h)(6) ("enrollment … strategies for eligible children").

108. CMS regulations do the same. *See, e.g.*, 42 C.F.R. § 457.10 (discussing information in an "eligibility notice," including the potential impact of a "determination of eligibility for, or enrollment in, another insurance affordability program"); *id.* § 457.60(b)(1) ("[e]ligibility standards, enrollment caps, and disenrollment policies"); *id.* § 457.300(c) ("[r]egulations relat[ed] to eligibility, screening, applications and enrollment"); *id.* § 457.525(b)(1) (cost-sharing information must be made available to "[e]nrollees, at the time of enrollment and reenrollment after a redetermination of eligibility"); *id.* § 457.570(b) (adjustment to a "child's cost-sharing category" if "the enrollee may have become eligible … for a lower level of cost sharing").

109. Congress chose to require only continuous "eligibility" against this statutory backdrop. 2023 CAA § 5112(a), (b), 136 Stat. at 5940; 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K). Had Congress intended to require continuous enrollment or coverage under a state CHIP plan, it would have said so. In fact, Congress did modify certain Medicaid and CHIP "coverage" in the very next section of the 2023 CAA. *See* 2023 CAA, § 5113, 136 Stat. at 5940 ("Modifications to Postpartum *Coverage* Under Medicaid and CHIP" (emphasis added)). Congress also passed section 5112 of the 2023 CAA instead of other

bills that would have required continuous enrollment for CHIP participants. *See* S. 646, § 3(b)(1) (requiring that "an individual who is determined to be eligible for benefits … shall remain eligible *and enrolled* for such benefits" for the duration of the specified period (emphasis added)); H.R. 1738, § 2(b)(1) (same).

110. CMS's interpretation of the 2023 CAA in STC 5.2 further conflicts with a clear statement from Congress that CHIP is *not* an entitlement program. 42 U.S.C. § 1397bb(b)(5) ("Nothing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan."). The 2023 CAA did not amend this provision. But CMS's interpretation nonetheless creates an entitlement under CHIP, because once enrolled participants are entitled to a full year of coverage regardless of whether they pay all required premiums.

111. At the very least, CMS's interpretation of the 2023 CAA in STC 5.2 violates "one of the most basic interpretive canons" that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up). CMS's reading eviscerates 42 U.S.C. § 1397cc(e)(3)(C), which permits States to "terminat[e]" an enrollee's "coverage" for nonpayment after "a grace period of at least 30 days." CMS claimed in its Final Rule that States can still disenroll a participant at the end of

the continuous eligibility period. 89 Fed. Reg. at 94466. But stretching a 30-day grace period to nearly a year transforms that provision beyond recognition, making 42 U.S.C. § 1397cc(e)(3)(C) "insignificant" and virtually "inoperative." *Corley*, 556 U.S. at 314 (cleaned up).

112. STC 5.2 is therefore contrary to law.

**COUNT TWO**

**(Violation of the APA: Excess of Statutory Authority)**

113. The allegations in paragraphs 1–23, 29–34, 36–83, 96 are expressly incorporated herein as if restated in full.

114. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory … authority." 5 U.S.C. § 706(2)(C). As explained in Count One, the unambiguous reading of the 2023 CAA is that CHIP participants must "remain *eligible* for [CHIP] benefits" for an entire year, not that the child must remain *enrolled* in a CHIP plan or receive those benefits. 2023 CAA § 5112(a), 136 Stat. at 5940 (emphasis added). CMS "must give effect to that clear intent." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1256 (11th Cir. 2020). CMS insists that STC 5.2 is required by the 2023 CAA. Ex. 7, Tsai Letter. But STC 5.2 does not implement the clear, unambiguous meaning of the 2023 CAA, and therefore exceeds CMS's authority. 5 U.S.C. § 706(2)(C).

115. The Supreme Court has "long rejected the notion that '*whatever* furthers the statute's primary objective must be the law.'" *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 434 (2018). Even if CMS believes "Congress could or should have done more," to ensure that children have insurance coverage, Congress "wrote the statute it wrote—meaning, a statute going so far and no further." *Id.* CMS has no authority to redefine "eligibility" in the 2023 CAA to include "enrollment."

116. Imposing STC 5.2 on the basis of the 2023 CAA therefore exceeds CMS's authority.

**COUNT THREE**

**(Violation of the APA: Arbitrary or Capricious)**

117. The allegations in paragraphs 1–23, 29–34, 36–83, 96 are expressly incorporated herein as if restated in full.

118. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). Agency actions must be "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. That means an agency rule must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). STC 5.2 and CMS's flawed interpretation of the 2023 CAA on which it is based are neither.

119. *First*, CMS cannot reasonably rely on an incorrect reading of the law to impose STC 5.2. As explained above in Counts One and Two, CMS's interpretation of the 2023 CAA does not implement the best meaning of the 2023 CAA. CMS's reading conflicts with the plain meaning of the 2023 CAA's text and the broader context of Title XXI. *See supra* ¶¶ 98–116.

120. STC 5.2 is also unreasonable because it is based on a logically inconsistent construction of the 2023 CAA. CMS asserts that STC 5.2 is required because "failure to pay premiums is not a permissible exception to continuous eligibility for children" since nonpayment of premiums is not one of the two circumstances enumerated in the 2023 CAA in which a State no longer must provide continuous eligibility. Ex. 7, Tsai Letter; *see also* 42 U.S.C. § 1396a(e)(12); 2023 CAA § 5112(a), 136 Stat. at 5940 (States do not need to provide continuous eligibility if the participant "attains the age of 19" or "ceases to be a resident" of the State). Setting aside that CMS mischaracterizes disenrollment for nonpayment of premiums as an "exception" to continuous eligibility,[8] CMS has elsewhere permitted three other "exceptions" that also are not enumerated in the 2023 CAA. *See* 42 C.F.R. §§ 435.926(d) (permitting

[8] As explained, eligibility and enrollment are distinct concepts and an individual remains eligible for CHIP benefits even if the individual is disenrolled, so disenrollment for nonpayment of premiums is not an "exception" to continuous eligibility. *See supra* ¶¶ 81–82, 102–109.

exceptions to Medicaid continuous eligibility where the "child or child's representative requests a voluntary termination of eligibility"; the "agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative"; or the "child dies"), 457.342 (applying exceptions to CHIP); Ex. 7, Tsai Letter (citing 42 C.F.R. §§ 435.926, 457.342). CMS explained that these other exceptions were permissible because they are "specific circumstances that do not involve a re-determination of eligibility based on a change in the beneficiary's circumstances during the [continuous eligibility] period." 89 Fed. Reg. at 94463. According to CMS, the 2023 CAA "did not foreclose termination of coverage in these situations, which are important to maintain program integrity." *Id.*

121. But in STC 5.2, CMS illogically prohibits another non-statutory "exception"—disenrollment for nonpayment of premiums—that meets the same criteria. Disenrolling a CHIP participant for nonpayment of premiums "do[es] not involve a re-determination of eligibility based on a change in the [participant's] circumstances during the [continuous eligibility] period." *Id.* And allowing disenrollment is crucial to "maintaining [the] integrity" and long-term sustainability of state CHIP plans and section 1115 demonstration projects, like Florida's, that incorporate cost-sharing as a fundamental component. *Id.*

122. CMS has not explained why disenrollment does not likewise qualify as an "exception" to the 2023 CAA under its own criteria. CMS's inconsistent and illogical decision to permit three regulatory "exceptions" while prohibiting another through STC 5.2 that meets the same criteria is arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (cleaned up)).

123. *Second*, STC 5.2 is arbitrary and capricious in how it purports to "promot[e] the objectives of [CHIP]." 42 U.S.C. § 1315(a) (permitting demonstration projects that are "likely to assist in promoting the objectives" of CHIP). Congress enacted CHIP to enable States to "expand the provision of child health assistance to uninsured, low-income children in an effective and efficient manner." *Id.* § 1397aa(a). But Congress made clear that CHIP does not "provid[e] an[y] individual with an entitlement to" health insurance. *Id.* § 1397bb(b)(5). Instead, Congress expressly allowed state CHIP plans to both require "premiums and cost-sharing" and disenroll participants for nonpayment after "a grace period of at least 30 days." *Id.* § 1397cc(e).

124. STC 5.2 undermines these objectives and ultimately results in *fewer* Florida children covered by CHIP. H.B. 121 was enacted and the Extension

Program's premium tiers were set assuming the collection of premiums. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra*, at 7. STC 5.2 negates those expectations and prevents Florida from moving forward with the Extension Program, since disenrollment is required by state law. Fla. Stat. §§ 409.8132(8), 624.91(5)(b)(9). STC 5.2 has already delayed implementation of the Extension Program and could prevent implementation altogether, depriving tens of thousands of Florida children of low-cost health insurance. STC 5.2 also transforms the Extension Program into an entitlement, guaranteeing participants 12 months of coverage even when they fail to pay premiums, contradicting Congress's express intent for CHIP. 42 U.S.C. § 1397bb(b)(5). And STC 5.2 erodes the careful balance Congress struck in allowing cost-sharing, while providing measured disenrollment protections. *Id.* § 1397cc(e). It is not "reasonable" for CMS to impose conditions on a section 1115 demonstration project that subvert, rather than promote, the purposes of CHIP. *Prometheus Radio Project*, 592 U.S. at 423; 42 U.S.C. § 1315(a).

125. *Finally*, nowhere did CMS consider the obvious and predictable effects of STC 5.2 on Florida's ability to implement the Extension Program consistent with state law, despite Florida directly raising that issue. *See* Ex. 5, Meyer Email. Reasoned decisionmaking requires "consideration of [all] relevant factors," which includes how the STC affects Florida's implementation of the

Extension Program. *State Farm*, 463 U.S. at 42–43. CMS's failure to do so was arbitrary and capricious. *Id.*

**COUNT FOUR**

**(Failure to Comply with Deadlines in Violation of FOIA)**

126. The allegations in paragraphs 1–20, 24–30, 35–64, 84–95, 97 are expressly incorporated herein as if restated in full.

127. Federal agencies must determine within 20 working days whether they will comply with a FOIA request and immediately notify the requester. 5 U.S.C. § 552(a)(6)(A)(i). Agency regulation further requires CMS to provide a determination of whether records will be released or withheld within 10 working days of the request in the appropriate office. 42 C.F.R. § 401.136(b). CMS may extend this period in the event of specified "unusual circumstances" for up to an additional 10 working days, but must provide notice of doing so. *See* 5 U.S.C. § 552(a)(6)(B); 42 C.F.R. § 401.136(c).

128. More than 20 working days have passed since CMS received AHCA's FOIA request on January 8, 2026. Ex. 9, FOIA Request Receipt; Ex. 10, CMS FOIA Confirmation.

129. CMS did not provide a final determination within 20 working days after receipt as required by statute, 5 U.S.C. § 552(a)(6)(A)(i), nor within 10 working days after receipt as required by regulation, 42 C.F.R. § 401.136(b). Nor

has CMS notified Florida that unusual circumstances warrant a 10-day extension. 5 U.S.C. § 552(a)(6)(B); 42 C.F.R. § 401.136(c).

130. CMS has thus failed to timely make a determination and respond, in violation of FOIA. *See* 5 U.S.C. § 552(a)(6); 42 C.F.R. § 401.136(b).

131. All administrative remedies required by FOIA have been constructively exhausted. *See* 5 U.S.C. § 552(a)(6)(C)(i); 42 C.F.R. § 401.148(b).

**COUNT FIVE**

**(Unlawful Withholding of Agency Records in Violation of FOIA)**

132. The allegations in paragraphs 1–20, 24–30, 35–64, 84–95, 97 are expressly incorporated herein as if restated in full.

133. FOIA requires CMS to process records requests and promptly provide the requested records or the reasonably segregable portion of records not subject to a FOIA exemption. 5 U.S.C. § 552(a)(3)(B), (C); 42 C.F.R. § 401.116(a).

134. CMS has neither provided Florida any responsive documents in response to AHCA's request, nor claimed that any responsive records are exempt from disclosure.

135. Therefore, CMS's failure to produce requested records or claim applicable exemptions violates FOIA. 5 U.S.C. § 552(a)(3)(B), (C); 42 C.F.R. § 401.116(a).

136. All administrative remedies required by FOIA have been constructively exhausted. *See* 5 U.S.C. § 552(a)(6)(C)(i); 42 C.F.R. § 401.148(b).

**COUNT SIX**

**(Declaratory Judgment)**

137. The allegations in paragraphs 1–97 are expressly incorporated herein as if restated in full.

138. Under the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

139. For the same reasons described in each of the previous counts, Florida is entitled to a declaratory judgment that Defendants have violated the APA, the Social Security Act, and FOIA.

**PRAYER FOR RELIEF**

Plaintiffs State of Florida and AHCA respectfully request that the Court:

A. Declare that STC 5.2 is unlawful, in violation of 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. §§ 1396a(e)(12), 1397gg(e)(1)(K), as amended by 2023 CAA § 5112(a), (b), 136 Stat. at 5940; and 42 U.S.C. § 1397cc(a)(3), (d), (e)(3)(C);

B. Hold unlawful and set aside STC 5.2, as required by 5 U.S.C. § 706(2);

C. Issue permanent injunctive relief enjoining Defendants from enforcing STC 5.2;

D. Declare that Defendants failed to timely make a determination on AHCA's request for records, in violation of FOIA and applicable regulations, 5 U.S.C. § 552(a)(6)(A)(i); 42 C.F.R. § 401.136(b);

E. Declare that Defendants failed to promptly provide records responsive to AHCA's request, in violation of FOIA and applicable regulations, 5 U.S.C. § 552(a)(3); 42 C.F.R. § 401.116(a);

F. Order Defendants to immediately conduct a reasonable search for all records responsive to the requests, as required by FOIA, 5 U.S.C. § 552(a)(3)(C);

G. Order Defendants to immediately provide a determination on AHCA's request, as required by FOIA, 5 U.S.C. § 552(a)(6)(A)(i);

H. Order Defendants to immediately and expeditiously provide Plaintiffs with all responsive, non-exempt records, as required by FOIA, 5 U.S.C. § 552(a)(3);

I. Award reasonable attorneys' fees and allowable costs, as provided in 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412(d);

J. Fully expedite this action pursuant to 28 U.S.C. § 1657(a); and

K. Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

Dated: May 1, 2026

Respectfully submitted,

James Uthmeier
*Attorney General*

David Dewhirst
*Solicitor General*

*/s/ Christine Pratt*
Christine Pratt (FBN 100351)*
*Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Christine.Pratt@myfloridalegal.com

* *Lead Counsel*
*Counsel for the State of Florida*

*/s/ Laura B. Ruppalt*
Jared M. Kelson (DC 241393)
(*PHV forthcoming*)
Laura B. Ruppalt (DC 90033927)*
(*PHV*)
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com
lruppalt@boydengray.com

Glenn Rininger (FBN 113086)
*General Counsel*
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3686
Glenn.Rininger@ahca.myflorida.com

* *Lead Counsel*
*Counsel for Agency for Health Care Administration*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2026, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action.

Dated: May 1, 2026

*/s/ Laura B. Ruppalt*
Laura B. Ruppalt